# IN THE COURT OF APPEALS OF IOWA

No. 19-0768
Filed January 23, 2020

IN RE THE MARRIAGE OF LARA CHRISTINE LUETHJE
AND NATHAN JON LUETHJE

Upon the Petition of
**LARA CHRISTINE LUETHJE,**
    Petitioner-Appellant,

**And Concerning**
**NATHAN JON LUETHJE,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Warren County, Paul R. Huscher, Judge.

Wife appeals the district court's custody determination in a dissolution decree. **AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

Leslie Babich and Amy K. Davis of Babich Goldman, P.C., Des Moines, for appellant.

Chira L. Corwin of Corwin Law Firm, Des Moines, for appellee.

Considered by May, P.J., Greer, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**GREER, Judge.**

Lara Luethje appeals from the decree dissolving her marriage to Nathan Luethje. The fighting issue is custody of the parties' children. Lara contends the shared custodial arrangement the district court crafted is unworkable and asks us to award her physical care of the parties' four children. Nathan maintains the district court's custodial care decision was correct. Both parties seek appellate attorney fees.

### I. Background Facts and Proceedings.

Lara and Nathan married in September 2005. The marriage was Lara's first and Nathan's second. This union produced four children, born in 2007, 2013, 2015, and 2016. Nathan's three children from his first marriage began living with the couple in 2006. Over time, the marriage began to crumble, due in large part to Nathan's paranoia[1] that Lara was having an affair.

In September 2018, Lara filed a dissolution petition and requested that the court award her physical care of the children. Nathan answered, also requesting physical care. As the legal proceedings advanced, the parties resolved some issues, including agreeing to joint legal custody of the children. They continued to disagree on a physical care arrangement.

The district court held a dissolution trial in April 2019, with the custody issue as the primary focus. Allegations of marital infidelity and the parents' behaviors dominated the trial. Recognizing that Iowa abandoned the requirement of proving

---

[1] Although not diagnosed with a paranoid personality disorder, Nathan's therapist testified: "It [Nathan's paranoia test score] was not above and beyond the normal population of that paranoia scale, but it does suggest one who is experiencing mistrust, resentful, past hurts that might lead to suspicious thinking, being vigilant."

fault in dissolution proceedings long ago, the district court disregarded the allegations of infidelity. Yet Nathan's paranoia and persistence on confirming an affair remained central to each party's case at trial.[2]

In their testimony, Lara and Nathan emphasized their roles, and each other's failings, in the day-to-day care of the children. To prove Nathan's lack of parental capabilities, Lara submitted a calendar and memorandum detailing Nathan's inattention to the children's needs, his consumption of alcohol, and their overall inability to communicate about responsibilities and care of the children. Nathan described his superior parenting abilities noting that the district court awarded him physical care of his three children from a previous marriage in a modification proceeding. Yet that ruling raised concerns about Nathan's inability to communicate with his first wife, even though custody ultimately transferred to him.[3]

After a three-day trial, the district court entered a ruling finding that the parties should share physical care of the children, alternating parenting time as follows:

> Lara shall have parenting time from Monday at 5:30 p.m. until Wednesday at 5:30 p.m. each week. Nathan shall have parenting time from Wednesday at 5:30 p.m. until Friday at 5:30 p.m. each week. The parties shall alternate every other weekend from Friday at 5:30 p.m. until Monday at 5:30 p.m. The party commencing their parenting time shall be responsible for transporting the children from school, daycare or the residence of the other parent unless otherwise agreed.

---

[2] As the district court noted, "A substantial portion of the testimony at trial concerned [Nathan's] suspicions that [Lara] engaged in extra-marital affairs, and his efforts to prove the truth of such suspicions through paternity testing, polygraph and confrontation of suspected paramours."

[3] The modification related to the first wife's inability to provide a safe home and issues with her live-in boyfriend's conduct.

The court ordered the parties to share holidays and summer vacation. Based on the shared-care arrangement, the court ordered Nathan to pay $93.17 per month in child support. All expenses related to the children's schooling and extracurricular activities were to be split equally between the parties with no expense made over $100 without prior approval by the other parent. The health insurance obligation remained Lara's as long as it was available through her employer.

Lara appeals. On appeal, each party requests appellate attorney fees.

## II. Standard of Review.

Marriage dissolution proceedings are equitable in nature. Iowa Code § 598.3 (2019). Thus, our review is de novo. *See* Iowa R. App. P. 6.907; *Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001). We review the entire record and decide anew the factual and legal issues preserved and presented for review. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). Although we give weight to the district court's findings of fact, we are not bound by them. *See In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015). Even so, we will affirm the district court unless it failed to do substantial equity. *See In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

## III. Custody Determination.

When physical care is at issue, our primary consideration is the best interests of the children. *See* Iowa R. App. P. 6.904(3)(o). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We review "a

nonexclusive list of factors to be considered when determining whether a joint physical care arrangement is in the best interests of the child." *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007).

> The factors are (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*Id.* (quoting *Hansen*, 733 N.W.2d at 697–99); *see also Hensch v. Mysak*, 902 N.W.2d 822, 824–25 (Iowa Ct. App. 2017) (same).

Here, after considering many factors, the district court determined that shared physical care was in the children's best interests, noting that "many good reasons exist for shared physical care, and [the court did] not find any compelling reason not to grant that request." We review the shared physical care award in light of the best-interests factors and the specific facts developed here. We respect that "[t]he trial court has the advantage of hearing the evidence and observing the witnesses." *In re Marriage of Brainard*, 523 N.W.2d 611, 614 (Iowa Ct. App. 1994). But we look to which parent will do better in raising the children into healthy, content, and well-adjusted young adults. *See In re Marriage of Rodgers*, 470 N.W.2d 43, 44 (Iowa Ct. App. 1991).

Good qualities exist in each parent. Factors supporting an award of physical care to Lara were her confirmed role as primary caretaker, the historical caregiving arrangement, and the flexibility afforded with her job at her family's business. Lara described herself as the primary caregiver for not only the parties' four children, but also for Nathan's three older children when they resided in the

home. She estimated she provided about eighty to ninety percent of the children's care. For the benefit of all the children, Lara handled scheduling doctor appointments, shopping for clothes, registering them for school, doing laundry, bathing the younger children, shopping for groceries, preparing meals, and staying home when a child was ill. Given all Lara did for the children, she emphasized her close relationship with the children and their dependence on her when asking the court to award her physical care. The district court supported Lara's assertions that she primarily cared for the children's day-to-day needs. "[S]uccessful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality." *Hansen*, 733 N.W.2d at 697.

Moreover, for all of their lives, the four children resided in the family home, which the district court awarded to Lara.[4] The oldest child testified he preferred to stay in the family home and live with his mother. Lara's mother and aunt live next door and provide a significant support system for Lara and the children. After Lara and Nathan separated, Lara encouraged contact between her children and stepchildren.

While Lara's schedule was flexible and allowed her to spend more time with the children, Nathan had a set work schedule and sometimes worked up to seventy hours per week. Yet until the parties separated, Nathan cared for the children after his work from 3:30 until 6:00 or 7:00 p.m. on most of Lara's workdays, per the schedule the parents arranged. Contrary to Lara's description of the caretaking

---

[4] Lara's deceased father's trust owns this home, where Lara, Nathan, and their family resided since 2006. In February 2019, Nathan bought a house within walking distance to Lara's. At the time of trial, he had been living in the home for a few weeks.

roles, Nathan's self-described parenting role involved bathing the children, putting them to bed, feeding them, playing video games with them, helping them with homework, and, when he attended college for a year, being a stay-at-home dad.

As might be expected, each parent recounted the personal failings of the other as it related to their caretaking abilities. Lara referenced Nathan's poor memory and his paranoid and accusatory behavior, coupled with his excessive nightly drinking of alcohol. She described Nathan as withdrawn, unavailable, and depressed. Lara points to a history of Nathan's failure to communicate with her regarding day-to-day care of the children and to a letter he wrote confirming he was "withdrawing" from the family. Nathan could not have overnight visitation of the parties' children after he moved out of the marital home because he had no beds or car seats available for the children.

Nathan accused Lara of limiting his time and contact with the children, exaggerating his failures, and turning family members against him. Nathan's witnesses supported his solid parenting skills and deep relationship with the children. Nathan contended that Lara and her family evicted him from the family home to obtain a custodial advantage. Nathan's counselor confirmed Nathan's feeling of withdrawal from the family, that he and Lara were poor communicators with each other about co-parenting, and that Nathan's emotions led him into isolation at times. Another concern that arose at trial was Nathan's drinking habit. Nathan acknowledged an uptick in his drinking because of an inability to sleep and the stress in his life. His counselor confirmed the heavy drinking as a poor coping skill. Nathan claimed he quit drinking after concerns arose in mediation.

The most concerning issue, however, is Nathan's unrelenting belief that Lara is having an affair. The district court brushed off these allegations as an attempt to prove fault and did not acknowledge any potential impact of that behavior to the appropriateness of a shared physical care arrangement. We assess his behavior differently.

While this case does not rise to the level of physical abuse, Nathan's persistent accusations of Lara for affairs yet unproven cannot be ignored. Beginning in 2011, and without evidence, Nathan accused Lara of having profiles on sex solicitation websites and of having affairs with his brother, coworkers, and family friends. Later that year, Nathan was driving in West Des Moines when he encountered a male family friend on a walk. The man got into Nathan's car, and after some small talk Nathan began accusing the man of having an affair with Lara. Nathan started driving the man to Indianola without his permission, apparently to take him to a computer so Nathan could show him proof of the affair. The man eventually convinced Nathan to take him home. Understandably, this incident terrified the family friend. Nathan was also convinced he was not the biological father of one of the parties' children. After a paternity test showed a 99.999% probability that he was the child's father, he remained unconvinced and suggested his brother could have fathered the child. He would sometimes come home from trips early to try to catch her cheating. Lara also presented evidence at trial that Nathan tracked her location, recorded video and audio of her, and in 2017 installed a camera in the living room of their home, all without her knowledge.

To quell Nathan's assertions of infidelity, and at Nathan's counselor's suggestion, Lara underwent a polygraph exam to prove no extramarital affair

occurred. Even so, Nathan's paranoia persisted. At one point Nathan threatened suicide. After sixty-three counseling sessions over a two-year period, Nathan remained steadfast in his beliefs about Lara's infidelity even through trial.[5] Nathan's counselor testified he had "obsessive thought causing anxiety that leads to compulsive strategies, psycho-obsessive compulsive features" related to his continued conviction that Lara cheated on him. The counselor, however, related the focus on infidelity to situational depression or anxiety that likely would subside after the divorce.

Crafting a joint custodial plan with the best interests of the children remains the goal. Both parents love these children, and by all accounts, the children are thriving. In addition, a primary consideration of the district court was preserving the children's bond with their stepsiblings. Iowa law presumes it is not in children's best long-term interests to deprive them "of the benefit of constant association with" their siblings. *See In re Marriage of Will*, 489 N.W.2d 394, 398 (Iowa 1992). The same principles govern awards of physical care when half-siblings are involved. *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). But the presumption may be overcome by compelling reasons. *In re Marriage of Pundt*, 547 N.W.2d 243, 245 (Iowa Ct. App. 1996). Nathan's behaviors before the trial work against a shared-care arrangement. *See Hansen*, 733 N.W.2d at 700–01 (concluding joint physical care was not in the best interests of the children, at least in part, due to the parents' "significant difficulties in communication" and the

---

[5] The counselor noted that in the two years of therapy, Nathan's "narrative never really changed in that way. At times throughout the course of therapy he did begin to become more open and flexible about some of his beliefs."

presence of "communication and respect issues"); *In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991) (finding mother's emotional problems weighed against her while continuous grandparent contact supported custody to the father).

While noting difficulties in communications between these parties, the district court believed the litigation to be the root cause. But this storyline began long before the divorce proceedings and involved Nathan's allegations against his brother, suicidal threats, and possible kidnapping of another suspected paramour. Requiring paternity tests and a polygraph and then threatening suicide in a letter strike of instability. This history fails to establish behavior supporting co-parenting skills, especially where Nathan has yet to make peace with these fears. Nathan's obsession with proving infidelity spilled over into his relationships with coworkers, friends, and family. We find it difficult to reconcile this history with a coordinated and conflict-free, shared-care plan. *See Hansen*, 733 N.W.2d at 698 ("A lack of trust poses a significant impediment to effective co-parenting."). Coupled with Lara's other allegations that Nathan failed to respond to her messages and inadequately communicated about meals, activities, and other needs of the children, we find stability weighs in favor of Lara. Additionally, Lara set no limitations on contact between her natural children and stepchildren,[6] so contact between all siblings can be often and substantial while she has physical care.

We do not believe that shared physical care is in the best interests of the children. We do, however, support a liberal visitation schedule for Nathan. Given

---

[6] Some evidence suggested Nathan prohibited his fifteen-year-old daughter from speaking with or visiting Lara.

the lingering issues between these parents and Nathan's inability to move forward by the time divorce was imminent, we reverse the award of the district court and find that primary physical care should be with Lara. We remand the case for entry of an order establishing this change, providing Nathan liberal visitation, and recalculating the child support obligation to align with this opinion.

### IV. Attorney Fees.

Each party requests appellate attorney fees. Appellate attorney fees are not a matter of right but may be awarded in the court's discretion. *See, e.g.*, *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).[7] In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request had to defend the decision of the trial court on appeal. *Hensch v. Mysak*, 902 N.W.2d 822, 827 (Iowa Ct. App. 2017). Having considered those factors, we decline to award appellate attorney fees.

### V. Disposition.

We modify the district court's custody determination and remand the case for entry of a modified decree reflecting Lara's primary physical care, Nathan's visitation, and a recalculation of child support. We deny the parties' requests for appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

---

[7] By agreement at trial, each party paid their own attorney fees and no attorney filed fee affidavits.